**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA, )
and STATE OF FLORIDA )
)
ex rel. REBECCA SPRINGER, )
) **Case No. 2:22-cv-00537-SPC-DNF**
Plaintiff-Relator, ) **JURY TRIAL DEMANDED**
)
v. )
)
HENDRY COUNTY HOSPITAL AUTHORITY, d/b/a )
HENDRY REGIONAL MEDICAL CENTER; )
SMALL HOSPITAL INNOVATIONS, LLC; )
OVATION HEALTHCARE, LLC, f/k/a QHR HEALTH[1], )
)
Defendants. )

**VERIFIED AMENDED FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Relator Rebecca Springer ("Relator") brings this Verified Amended False Claims Act Complaint and Demand for Jury Trial on behalf of herself, the United States of America, and the State of Florida against Defendants Hendry County Hospital Authority, d/b/a Hendry Regional Medical Center; Small Hospital Innovations LLC; and Ovation Healthcare, LLC, f/k/a QHR Health (hereinafter "QHR Health") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("federal FCA"), and of the Florida False Claims

[1] At the time of the filing of the Complaint in 2022, Ovation Healthcare was known as Quorum Health Resources, LLC, d/b/a QHR Health.

Act, sections 68.081, *et seq.*, Florida Statutes ("Florida FCA") (collectively, the "False Claims Act").

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b), and 28 U.S.C. §§ 1331, 1345. This court has jurisdiction over the Florida FCA claim pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

4. As required by the federal FCA, 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a statement of all material evidence and information related to the Complaint ("Disclosure Statement").

5. The Disclosure Statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the Attorney General of the United States and the United States Attorney for the Middle District of Florida in their capacities as potential co-counsel in this litigation; therefore, the Disclosure Statement is confidential and protected by the joint prosecutorial privilege.

## INTRODUCTION

6. Hendry Regional Medical Center ("HRMC") schemed to bill Medicare, Medicaid, and other government healthcare programs for critical care that was not necessary or indicated by patients' medical conditions.

7. HRMC's practice was to admit non-critically ill patients to its intensive care unit ("ICU") to bill for the more expensive critical care rather than less expensive intermediate care or for observation/in-patient care.

8. In actuality, HRMC's ICU is not equipped to deliver critical care and could not deliver that level of care.

9. In order to ensure admissions continued to the sham ICU, HRMC paid kickbacks to physicians to keep admissions, and thereby claims for critical care, at a maximum level.

## GOVERNMENT HEALTHCARE PROGRAMS

10. Title XVIII of the Social Security Act, U.S.C. §§ 1395, *et seq.,* establishes the Health Insurance for the Aged and Disabled Program, known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

11. The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c-i-5.

Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

12. Reimbursement for Medicare Part A claims is made by the United States through CMS. Hospitals submit Medicare Part A claims directly to CMS, which in turn makes a standard, bundled payment based on a Diagnosis-Related Group ("DRG") diagnostic code.

13. Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011 (adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT

Manual”)).

14. Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

15. Reimbursement for Medicare Part D claims is made by the United States through CMS.

16. As part of the enrollment process for the Medicare program, providers certify that they agree to abide by the Medicare laws, regulations, and program instructions and that they understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (“Stark Law”), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).

## THE ANTI-KICKBACK STATUTE

17. The Anti-Kickback Statute (“AKS”) prohibits the knowing and willful offering, paying, solicitation, or receipt of remuneration in cash or in kind to induce or reward patient referrals or the generation of business involving any item or service payable by Federal Insurance, including Medicaid, Medicare, and Tricare. 42 U.S.C. §1320a–7b.

18. Pursuant to the AKS, a claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the federal FCA. 42 U.S.C. § 1320a-7b(g).

19. Compliance with the AKS is material to claims for payment pursuant to the CMS-855O Medicare Enrollment Application, which conditions payment on compliance with the statute, and case law that has determined that violations of the AKS are material. *See U.S. ex rel. Lutz v. Berkeley Heartlab, Inc.*, 2017 U.S. Dist. LEXIS 138722, at *9 (D.S.C. Aug. 27, 2017) (applying common sense and weight of authority).

20. The State of Florida has its own Anti-Kickback Statute, Florida Administrative Code 59G-1.050(11), which, *inter alia*, prohibits payment in return for referring an individual to a person for furnishing any service for which payment may be made under the Florida Medicaid program.

## SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY

21. Reimbursement practices under all Government Healthcare Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Healthcare Programs is that the service or item provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (Medicare does not cover items or services that "are

not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 42 C.F.R. §§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme.").

22. Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3).

23. These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000). Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to artificially (*i.e.*, unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *U.S. ex rel. Vainer v. Davita, Inc.*, 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

24. Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions. *See, e.g.,* Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

25. Claims submitted by healthcare providers to Government Healthcare Programs contain similar representations and certifications. *See, e.g.*, Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP, and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Government Healthcare Program laws and regulations. Government Healthcare Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State

health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

## PARTIES

26. Defendant Hendry County Hospital Authority, d/b/a Hendry Regional Medical Center ("HRMC") is a critical access hospital located at 524 West Sagamore Avenue, Clewiston, Florida 33440.

27. HRMC converted to a critical access hospital in 2006. HRMC has 25 beds, the maximum allowed for a critical access hospital under Medicare regulations. *See* 42 CFR § 485.620.

28. HMRC claims to have an Intensive Care Unit ("ICU") with 3 beds, which opened in 2006 when HRMC converted to a critical access hospital.

29. HRMC also has a surgical department that consists of two beds, a ten-bed Emergency Room ("ER"), and ten beds designated for outpatient and admitted patients who have not been admitted to the ICU.

30. The 22 non-ICU beds are collectively called the Medical/Surgical/ Telemetry ("MST") Unit.

31. Defendant Small Hospital Innovations LLC ("SHI") is a physician practice group that has contracted with HRMC to provide physician services at HRMC.

32. SHI physicians are contracted to provide services in the ER (ER physicians) and also to provide physician services for patients admitted as an Inpatient or as an Observation stay (Hospitalist physicians).

33. Defendant QHR Health is a health care management company with a principal office located at 1573 Mallory Lane, Suite 200, Brentwood, TN 37027.

34. HRMC contracted with QHR to provide management services for HRMC. As part of that contract, two QHR employed individuals serve as HRMC's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"). Both positions were compensated by QHR, while HRMC made monthly payments to QHR under the contract.

35. In addition, HRMC relies on QHR to provide regulatory guidance and compliance oversight.

36. Relator Rebecca Springer ("Relator") served as the Chief Nursing Officer ("CNO") of HRMC from her hiring date in February 2015 until her termination in March 2021.

37. As CNO, Relator was a member of HRMC's Senior Leadership Team, which in addition to the CNO consisted of the CEO, CFO, and COO.

38. Accordingly, Relator has firsthand knowledge of HRMC's decision making at the highest level and was privy to executive meetings and conversations about the factual allegations contained herein.

39. Relator was terminated in March 2021 in retaliation for her complaints on a falsified allegation that she had violated a patient's rights under the Health Insurance Portability and Accountability Act ("HIPAA"), an allegation of which she was exonerated of by Florida's Board of Nursing.

## FACTUAL ALLEGATIONS

### Background Regulations

40. CPT codes 99291 and 99292—Critical Care Time—are intended to reimburse providers for care provided in life-threatening situations. They require the patient to be both critically ill and for the treatment to reflect the critical nature:

> Pay for services reported with CPT codes 99291 and 99292 when all the criteria for critical care and critical care services are met. Critical care is defined as the direct delivery by a physician(s) medical care for a critically ill or critically injured patient. A critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition.
>
> Critical care involves high complexity decision making to assess, manipulate, and support vital system functions(s) to treat single or multiple vital organ system failure and/or to prevent further life threatening deterioration of the patient's condition.
>
> Examples of vital organ system failure include, but are not limited to: central nervous system failure, circulatory failure, shock, renal, hepatic, metabolic, and/or respiratory failure. Although critical care typically requires interpretation of multiple physiologic parameters and/or application of advanced technology(s), critical care may be provided in life threatening situations when these elements are not present.

> Providing medical care to a critically ill, injured, or post-operative patient qualifies as a critical care service only if both the illness or injury and the treatment being provided meet the above requirements....
>
> Critical care services must be medically necessary and reasonable. Services provided that do not meet critical care services or services provided for a patient who is not critically ill or injured in accordance with the above definitions and criteria but who happens to be in a critical care, intensive care, or other specialized care unit should be reported using another appropriate E/M code (e.g., subsequent hospital care, CPT codes 99231-99233.

Medicare Claims Processing Manual, Ch. 12, § 30.6.12; *see also* MLM Matters No. MM5993.

**<u>Fraudulent Conduct</u>**

41. Relator was hired as CNO of HRMC in early 2015.

42. Quite early in her tenure, Relator witnessed firsthand that HRMC was admitting patients to its ICU that did not have a diagnosis typically related to ICU patients and who were not critically ill.

43. In some instances, patients were admitted to the ICU who were merely overflow patients, waiting for a bed and/or room in the MST unit, who did not need critical care.

44. Despite the fact that they did not need critical care, HRMC billed for critical care for these patients.

45. Relator recalls witnessing the following types of patients with non-ICU diagnosis/conditions that were routinely admitted to HRMC's ICU and for

whom critical care was billed: non cardiac, respiratory patients with mild or non-symptomatic COPD; elderly patients needing observation to reduce falling risk; patients that had an undiagnosed condition, but "may get sicker during the night;" patients in need of Point of Care testing ("POC") such as blood glucose monitoring but who were not critically ill; and patients on do not resuscitate status ("DNR").

46. This is only a sampling; Relator recalls patients with other non-ICU diagnoses beyond these examples who were admitted to HRMC's ICU.

47. Every patient admitted to HRMC's ICU did not meet Medicare's guidelines for critical care, nor was critical care delivered to those patients. HRMC's billing for intensive care/critical care for these ICU patients was knowingly false.

48. Relator began questioning the ICU admissions after initially observing the non-critically ill patients that HRMC was admitting to its ICU.

49. Relator tried to discourage the admission of patients that did not have an actual ICU complexity diagnosis, but she received significant push back from HRMC's CEO, CFO, and the ER physicians who were ordering the ICU admissions.

50. After observing the pattern of fraudulent ICU admissions for months, in October 2015 Relator requested a meeting with the Emergency

Department Medical Director and the in-patient Medical Director, to discuss the pattern and potential solutions or alternatives to the admission practices.

51. Relator suggested converting the ICU to a Progressive Care Unit ("PCU"). Relator believed that HRMC was not delivering critical care to its admitted ICU patients and could not deliver that level of care, and the conversion of that unit to an intermediate level of care unit, or PCU, would more accurately reflect the level of care being delivered and the types of patients HRMC was admitting to the unit.

52. Part of Relator's proposal was to retrain the staff and nurses on PCU care. The result would be that HRMC could provide intermediate care to patients who required a higher level of care than that being delivered in the MST unit but would not purport to be providing critical care typically delivered in an ICU.

53. The entire basis of Relator's proposal was that HRMC was not delivering critical care in its ICU and could not do so—but that with proper training of staff and nurses, HRMC would be able to accurately provide and bill for progressive care in a PCU.

54. Relator successfully convinced HRMC to convert the ICU to a PCU. The PCU was approved in or around October 2015.

55. Upon the formal approval of creating the PCU from the ICU, Relator suggested that HRMC file notice with the State of Florida's Joint Commission

that the hospital would be changing the services it would provide, as she believed HRMC was required to do.

56. Both the CEO and CFO disagreed, stating to Relator that such a filing was not necessary. Therefore, the State of Florida was not notified that HRMC was changing its ICU to a PCU.

57. In January 2016, Relator began the education and training of HRMC staff regarding appropriate care in a PCU.

58. During the training period of approximately six months, the ICU/PCU unit was closed, and no patients were admitted to the unit.

59. Relator provided training and education on types of hospital admissions and the type of appropriate intermediate care delivered in a PCU unit.

60. Medical staff and hospital staff participated in the training. Relator even met with the then-Business Office Director ("BOD"), to coordinate the change of the three-bed ICU to a three-bed PCU and to advise on updating the charge master to reflect PCU charges instead of ICU charges.

61. Subsequent to this training, HRMC policies were changed to reflect the updated care being provided in a PCU setting instead of an ICU.

62. Additionally, Relator met with the Health Information Management ("HIM") Director and facility coder, to advise on the types of diagnosis that would be standard in a PCU unit in contrast to diagnoses typical in an ICU.

63. Finally, the three-bed unit was lightly remodeled to bring it up to standard of care for a PCU unit and hospital signage was updated to indicate a PCU, instead of an ICU.

64. In July 2016, Relator opened HRMC's new three-bed PCU unit. During her oversight of the PCU unit, patients were admitted appropriately to the unit.

65. However, in April 2017, claims for care in the PCU began to be denied by both private and government payors at a greatly increased rate. Relator was told not to worry about the increased denials.

66. In the latter part of 2017, Relator began witnessing patients being admitted to HRMC's PCU unit with a diagnosis of sepsis. However, none of these patients were septic and Relator became more worried that improper admissions were happening again.

67. At that time Relator requested a meeting with the Chief Operating Officer/Compliance Officer, the Director of Quality, and HIM Director, to discuss the diagnosis of sepsis and admitting patients to the PCU with such a diagnosis.

68. In this meeting, the HIM Director told Relator and the others present that she used Google to look up billing codes when there was not enough documentation in the chart from the physician to code the chart

appropriately. She would then add that information to the documentation, in order to justify the codes.

69. Relator recalls vividly one such patient example: a patient in their 70s was diagnosed with sepsis and the claim submitted for the services provided had eight or more sepsis codes, including Toxic Shock Syndrome, because the HIM Director Googled the patient's symptoms and then listed every code the internet provided.

70. Despite this openly noncompliant behavior, the Compliance Officer was uninterested in correcting the situation.

71. In response to the increase in incorrect sepsis diagnoses and lack of response from the Compliance Officer, Relator went to the BOD and requested to review billing claims for patients admitted to the PCU for sepsis.

72. Relator recalls reviewing approximately fifty patients charts at that time. To her astonishment, all PCU patients (some of whom were admitted incorrectly even to the PCU) had been billed as if they were seen in an ICU and receiving critical care.

73. Relator questioned the BOD as to why these patients were being billed as ICU patients. Relator was told by that HRMC always billed the 3-bed unit as an ICU regardless of what care was being delivered.

74. In the early part of 2018, Relator was directed to close the PCU unit.

75. The unit was closed for several months to facilitate the switch back to an ICU.

76. All policies, education, and signage were updated to reflect the presence of an ICU. However, there was no remodeling or installation of any additional equipment in the unit to update it from a PCU to an ICU.

77. In approximately summer 2018, HRMC's ICU reopened. Inappropriate admissions to the alleged ICU continued.

78. Everyone involved at HRMC, leadership, staff, nurses, and physicians, knew that HRMC was not capable of caring for a critically ill ICU patient.

79. If a critically ill patient was seen in HRMC's ER and required ICU care, that patient was transferred to a facility with an actual ICU—a practice that occurred almost daily.

80. The transfer rate from the emergency department at HRMC was well over ten percent, which is above the national average.

81. All patients admitted to the ICU at HRMC were not patients in need of critical, ICU care. Yet critical care was billed to payors as if critical, ICU care was provided.

82. Inappropriate admissions and billing for ICU/critical care continued at HRMC unfettered until March 2020, when the COVID 19 pandemic began.

83. Relator closed the ICU at HRMC for several months due to the pandemic and resulting influx of patients seen at HRMC with COVID 19.

84. The ICU was equipped with positive pressure and therefore was not an appropriate unit to treat COVID patients. Senior leadership agreed with that decision and the unit was closed.

85. HRMC's ICU reopened in or around May or June 2020, and at that time it was used to treat COVID-19 patients only.

86. Relator was able to install negative pressure in a separate physical location from the prior three-bed ICU unit to treat COVID-19 patients. When the unit reopened it consisted of four beds. Relator believes patients admitted to the new ICU unit were critically ill patients with COVID-19.

87. That procedure continued until the latter part of 2020. Relator believes on or about December of 2020, the Centers for Disease Control and Prevention ("CDC") changed its guidelines regarding how hospitals treated COVID-19 patients.

88. As such, HRMC decided to close the four-bed COVID-19 ICU because it was no longer needed and negative pressure was no longer being recommended. The four beds were returned to the MST unit.

89. At this time, the CFO and CEO began to assert pressure to reopen the three bed ICU unit and resume the admission scam to help revenue.

90. Relator protested and even went to HRMC's Hospital Authority Board and argued that the ICU should not be reopened because the hospital did not have the appropriate staffing nor the equipment to treat critically ill patients.

91. Despite Relator's protests, the three-bed ICU unit was reopened in or about January of 2021. The admission of non-critically ill patients and billing as if that care was delivered, resumed.

92. Relator, recognizing the return to the admission fraud scam, did everything in her power to prevent it.

93. When doctors ordered the admission of non-critically ill patients, Relator would go speak to the admitting physician and ask him/her to outline why this patient should be admitted to the ICU.

94. In many instances she could convince the doctor not to admit to the ICU because it was not warranted. Other times, Relator would direct the doctor to transfer the patient to another facility, telling the doctor that the ICU did not have any nurses available for the admission.

95. This was a daily battle that Relator had with admitting physicians once the three-bed ICU reopened in early 2021.

96. In addition, both the CFO and CEO recognized Relator's conduct of pushing back against these admissions.

97. In January through March of 2021, Relator was frequently admonished by both the CFO and CEO for the lack of ICU patient admissions in the hospital.

98. Finally, apparently having enough of Relator's resistance, she was fired as CNO in March of 2021 on a falsified charge that she had violated HIPAA as it related to a particular patient.

99. HRMC attempted to report Relator to the Florida Board of Nursing on this falsified charge.

100. The Board of Nursing cleared Relator of any wrongdoing, and she continues her distinguished career. She believes she was terminated for her numerous complaints regarding the improper practices HRMC engaged in regarding its ICU admissions.

**HRMC's ICU was incapable of delivering the critical care for which it billed**

101. In addition to admitting non-critically ill patients to its ICU, HRMC's alleged ICU was not equipped with necessary lifesaving equipment, nor was it staffed appropriately to deliver ICU/critical care. Thus, HRMC, despite ensuring that its three-bed "ICU" was full at all times, it never delivered the ICU level critical care for which it billed.

102. In fact, if a critically ill patient was seen in HRMC's ER and needed an actual ICU, that patient would be immediately transferred to a facility that could deliver ICU level critical care.

**Background Regulations**

103. According to Medicare regulations, intensive care type inpatient hospital unit means a hospital unit that furnishes services to critically ill inpatients.

104. Examples of intensive care type units include, but are not limited to, intensive care units, trauma units, coronary care units, pulmonary care units, and burn units. Excluded as intensive care type units are postoperative recovery rooms, postanesthesia recovery rooms, maternity labor rooms, and subintensive or intermediate care units. 42 CFR § 413.53(d).

105. Additionally, a unit will be identified as an intensive care type inpatient hospital unit only if the unit:

> (1) Is in a hospital;
>
> (2) Is physically and identifiably separate from general routine patient care areas, including subintensive or intermediate care units, and ancillary service areas. There cannot be a concurrent sharing of nursing staff between an intensive care type unit and units or areas furnishing different levels or types of care. However, two or more intensive care type units that concurrently share nursing staff can be reimbursed as one combined intensive care type unit if all other criteria are met. Float nurses (nurses who work in different units on an as-needed basis) can be utilized in the intensive care type unit. If a float nurse works in two different units during the same eight hour shift, then the costs must be allocated to the appropriate units depending upon the time spent in those units. The hospital must maintain adequate records to support the allocation. If such records are not available, then the costs must be allocated to the general routine services cost areas;
>
> (3) Has specific written policies that include criteria for admission to, and discharge from, the unit;

(4) Has registered nursing care available on a continuous 24-hour basis with at least one registered nurse present in the unit at all times;

(5) Maintains a minimum nurse-patient ratio of one nurse to two patients per patient day. Included in the calculation of this nurse-patient ratio are registered nurses, licensed vocational nurses, licensed practical nurses, and nursing assistants who provide patient care. Not included are general support personnel such as ward clerks, custodians, and housekeeping personnel; and

(6) Is equipped, or has available for immediate use, life-saving equipment necessary to treat the critically ill patients for which it is designed. This equipment may include, but is not limited to, respiratory and cardiac monitoring equipment, respirators, cardiac defibrillators, and wall or canister oxygen and compressed air. 42 CFR § 413.53(d).

**Fraudulent Conduct**

106. As CNO of HRMC, Relator knows that the alleged ICU was never equipped to handle critically ill patients. As described above, HRMC admitted patients and billed CMS for critical care for patients that did not need nor receive such care.

107. HRMC billed for the higher-level critical care so that it would be reimbursed at a higher rate.

108. HRMC converted to a critical access hospital in 2006. It was at this time that HRMC first opened the three bed ICU. Prior to being the ICU, the three-bed unit was an operating room ("OR").

109. HRMC made no modifications to the unit when converting it from an OR to an ICU.

110. In fact, no modifications or equipment updates were made to the ICU until 2016 when Relator converted the unit to a PCU.

111. When Relator made the PCU suggestion and convinced leadership to support it, she determined that the unit did not even meet standard of care for a PCU unit and thus remodeled and updated equipment to meet PCU standards.

112. Yet throughout this time, HRMC claimed to have an ICU and was billing for critical care, while the unit did not meet standard of care for an ICU and was incapable for delivering critical care.

113. In addition, HRMC's ICU did not meet the following requirements of 42 CFR § 413.53(d):

> -HRMC had concurrent nurses working in both the ICU and the MST unit in violation of (d)(2).
>
> -HRMC also had float nurses working in the ICU and MST units during the same shift and did not document the allocation of time those nurses spent in the separate units during a shift in violation of (d)(2).
>
> -HRMC did not have registered nursing care available on a continuous 24-hour basis in violation of (d)(4).
>
> -HRMC did not have at least one registered nurse present in the ICU at all times in violation of (d)(4).
>
> -Relator believes that HRMC did not meet the requirements of (d)(6) as well, which requires lifesaving equipment be available for immediate use for critically ill patients. While the ICU did have the equipment present, it was set up as an OR with no updates of equipment or layout. In fact, the equipment and layout of the ICU was no different than the in-patient MST unit

at HRMC. In addition, there were no sinks or toilets in the unit for patient use.

114. In short, HRMC never intended to deliver critical care, it only wanted to bill the government for critical care. Thus, it set up a sham ICU and admitted non-critically ill patients and submitted false claims to the government for critical care that was not delivered and could not be delivered.

**HRMC paid improper kickbacks to SHI for ICU admissions**

115. The final piece of the ICU fraud puzzle were the admitting physicians. HRMC paid kickbacks to SHI's ER physicians for each and every ER patient that an ER physician ordered admitted to the ICU.

116. HRMC also paid kickbacks to ER physicians for admissions to the MST twenty-two-bed unit. Both practices led to the admission of patients that did not meet appropriate ICU and MST admission criteria.

**Background Regulations**

117. The AKS arose out of Congressional concern that if those who influence healthcare decisions were allowed to have a financial stake in selection of healthcare goods and services, their judgment might be tainted, resulting in goods and services being provided that are medically unnecessary, of poor quality, or even harmful.

118. Among other provisions, the AKS make criminal certain types of remunerative arrangements:

> (b) Illegal remunerations.
>
> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind-
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (2) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years or both. 42 U.S.C.S § 1320a-7b

119. Violation of the AKS subjects the perpetrator to exclusion from Federal health care programs, civil money penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and (a)(7).

120. It is well settled that compliance with the AKS is a precondition to Medicare payment, and the Affordable Care Act ("ACA") explicitly provides that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes of the [the FCA]." Thus, compliance with the AKS is per se material to payment of Federal health care program claims.

**Fraudulent Conduct**

121. As a member of HRMC's leadership team, Relator was privy to how HRMC paid its ER physicians. HRMC contracted with SHI to provide ER physician services and made monthly payments to SHI for services provided by SHI employed ER physicians.

122. The contract for services included monthly admission goals for the ER physicians. SHI would receive quarterly bonuses from HRMC if it met and exceeded the admission goal.

123. An addendum to the contract specified the calculations for the bonus payments to SHI, and that ICU admissions were paid at a higher rate than

an inpatient admission to the MST unit. This payment structure was in place for the entirety of Relator's employment at HRMC.

**Pain Management Clinic**

124. From approximately 2010 to 2019, HRMC owned and operated an interventional pain management clinic which was run by an HRMC employed physician.

125. In the early part of 2019, HRMC's board of directors received a complaint from a community resident that he HRMC physician overseeing the clinic was running a pill mill at the HRMC pain management clinic.

126. The complainant provided details of how often and how many narcotic pain killers prescribed to a family member of the complainant. HRMC paid for an outside audit of the pain management clinic.

127. The outside auditor came on site and observed the HRMC physician overseeing the clinic and the rate and quantity at which he was prescribing narcotic pain killers and administering expensive pain and spinal injections and produced a formal audit report. However, Relator has never seen the report and believes that no one outside of the CEO has ever seen the report.

128. The pain management clinic was shut down by HRMC's CEO immediately subsequent to the outside audit.

129. Despite the audit (and its apparently dire results) and the immediate closure of the clinic, HRMC made no repayments to CMS or any other payor related to the services provided at the interventional pain management clinic.

130. For these reasons, Relator believes that the HRMC physician overseeing the clinic was providing medically unnecessary narcotic prescriptions and administering medically unnecessary injections to patients.

**COUNT I**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**
**(All Defendants)**

131. Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-130.

132. As set forth above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

133. Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

134. Relator is entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

**COUNT II**
**Violation of 31 U.S.C. § 3729(a)(1)(B)**
**(All Defendants)**

135. Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-130.

136. As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the federal FCA, 31 U.S.C. § 3729(a)(1)(B).

137. Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

138. Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

**COUNT III**
**Violation of 31 U.S.C. § 3729(a)(1)(C)**
**(All Defendants)**

139. Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-130.

140. As set forth above, Defendants knowingly conspired to commit a violation of the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

141. Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

142. Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

**COUNT IV**
**VIOLATION OF FLORIDA FALSE CLAIMS ACT**
**SECTION 68.082(2)(a), FLORIDA STATUTES**
**(All Defendants)**

143. Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-130.

144. As set forth above, Defendants knowingly presented, or caused to be presented to the Florida Medicaid program, numerous false or fraudulent claims for payment or approval, in violation of section 68.082(2)(a), Florida Statutes.

145. Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. § 68.082(2), Fla. Stat.

146. Relator is entitled to reasonable attorneys' fees, costs, and expenses. § 68.085, Fla. Stat.

**COUNT V**
**VIOLATION OF FLORIDA FALSE CLAIMS ACT**
**SECTION 68.082(2)(b), FLORIDA STATUTES**
**(All Defendants)**

147. Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-130.

148. As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of section 68.082(2)(b), Florida Statutes.

149. Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. § 68.082(2), Fla. Stat.

150. Relator is entitled to reasonable attorneys' fees, costs, and expenses. § 68.085, Fla. Stat.

**COUNT VI**
**VIOLATION OF FLORIDA FALSE CLAIMS ACT**
**SECTION 68.082(2)(c), FLORIDA STATUTES**
**(All Defendants)**

151. Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-130.

152. As set forth above, Defendants knowingly conspired to commit a violation of the Florida False Claims Act, in violation of § 68.082(2)(c), Fla. Stat.

153. Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. § 68.082(2), Fla. Stat.

154. Relator is entitled to reasonable attorneys' fees, costs, and expenses. § 68.085, Fla. Stat.

**COUNT VII**
**VIOLATION OF 31 U.S.C. § 3730(h)—RETALIATION**
**(Defendant Hendry Regional Medical Center)**

155. Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-100.

156. Defendant Hendry Regional Medical Center violated Relator Springer's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against her for lawful acts done by her in furtherance of an action under the federal FCA and other efforts to stop one or more violations alleged in this action, including, *inter alia*, increasingly scrutinizing his performance, pressuring him to violate the pertinent laws, rules, and regulations, and ultimately constructively terminating her employment.

157. As a result of Defendant's actions, Relator has suffered damages in an amount to be shown at trial.

158. Relator is entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(h).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants:

(a) awarding the United States, treble damages sustained by it for each of the false claims;

(b) awarding the United States, the maximum civil penalty for each of the false claims and statements;

(c) awarding the state of Florida, treble damages sustained by it for each of the false claims;

(d) awarding the state of Florida, the maximum civil penalty for each of the false claims and statements;

(e) awarding Relator an appropriate percentage of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(f) awarding Relator all relief available, including special damages, resulting from retaliation pursuant to 31 U.S.C. § 3730(h);

(g) compensatory damages for lost wages, benefits, and any other applicable remuneration;

(h) other compensatory damages as permitted by law;

(i) prejudgment interest;

(j) awarding Relator litigation costs and reasonable attorneys' fees pursuant to the federal FCA and the Florida FCA;

(k) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demand trial by jury on all issues and counts triable as of right before a jury.

Dated: April 9, 2026

Respectfully submitted,

/s/Jill S. Schwartz
Jill S. Schwartz, Esquire
Florida Bar No. 523021
David H. Spalter, Esquire
Florida Bar No. 966347
John M. Hunt, Esquire
Florida Bar No. 91168
**Jill S. Schwartz & Associates**
655 West Morse Boulevard, Suite 212
Winter Park, Florida 32789-3745
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
jschwartz@schwartzlawfirm.net
dspalter@schwartzlawfirm.net
jhunt@schwartzlawfirm.net

Nathan Peak (applying for *pro hac vice*)
**Bracker & Marcus LLC**
District of Columbia Bar No. 978215
3355 Lenox Road, Suite 660
Atlanta, Georgia 30326
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Nathan@fcacounsel.com

**VERIFICATION**

Personally appeared before the undersigned, REBECCA SPRINGER, who being first duly sworn, deposes and says that the allegations of this Verified Amended False Claims Act Complaint and Demand for Jury Trial consisting of Paragraphs 1 through 158, inclusive, are true and correct to the best of her knowledge, information, and belief.

Rebecca Springer
REBECCA SPRINGER

STATE OF Florida )
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this 7th day of April, 2026, by REBECCA SPRINGER, who is personally known to me or who has produced ____________________ as identification, and who did take an oath.

Amy J Cook
Notary Public
My Commission Expires: 8/22/27

AMY COOK
Notary Public - State of Florida
Commission # HH 391828
My Comm. Expires Aug 22, 2027
Bonded through National Notary Assn.